SOUTHWESTERN BELL TELEPHONE
COMPANY, a corporation, Respondent,

v.

CHESTER A. DEAN CONSTRUCTION
COMPANY, a corporation, and Mid-Continent Plumbing, Inc., a corporation, Appellants.

No. 49351.

Supreme Court of Missouri,

Division No. 1.

July 8, 1963.

Rehearing Denied Sept. 9, 1963.

John R. Baty, Kansas City, Sheridan, Baty, Markey, Sanders, Edwards & Carr, Kansas City, of counsel, for appellant Chester A. Dean Construction Company.

Edwin W. Rooker, Houts, James, Randall, Hogsett & McCanse, Kansas City, for appellant Mid-Continent Plumbing, Inc.

Howard A. Crawford, Robert D. Youle, Joseph E. Stevens, Jr., Kansas City, John Mohler, Philip L. Wettengel, William C. Sullivan, St. Louis, of counsel, for respondent.

COIL, Commissioner.

The Southwestern Bell Telephone Company brought an action to recover $150,000 as damages for alleged injury to its communications equipment which was located in a basement room of building 100 at the Richards-Gebaur Air Force Base in Jackson County. Defendants below (appellants here) were Chester A. Dean Construction Company, a corporation (hereinafter called Dean), and Mid-Continent Plumbing, Inc., a corporation. A jury found for Bell against both defendants and assessed damages in the sum of $30,000. Dean contends the trial court erred in refusing to direct a verdict for it at the close of all the evidence, in refusing to give its tendered instruction 12, in excluding testimony, and in giving respondent's instruction 4. Mid-Continent contends the trial court erred in refusing to give its proffered instruction 13.

In June 1958 the United States entered into a contract with Dan Truog and Clyde Nichols, Inc., to air condition building 100, which was an E-shaped structure, the main part of which, for the purposes of this case, ran east and west with the three prongs of the E running north-south. Under the center prong was the basement which contained, among other things, Bell's communications equipment. Air-conditioning equipment was to be installed in a room to be constructed adjacent to the west side of the existing basement. A six-inch water main ran from north to south into the area of the proposed new room and made a 90-degree turn left through the wall and into the basement of building 100 and, of course, that water main had to be relocated. The general contractor, Truog-Nichols (who originally was a defendant but who settled with Bell prior to trial), subcontracted with Dean for the erection of the new equipment room (including excavating to the depth of the existing basement), and subcontracted with Mid-Continent certain plumbing work, including the relocation of the main.

Dean began excavating with a high loader about August 1 [1] and soon exposed the top of the water main. The general contractor thereupon directed Dean to hand excavate in the area of the pipe for which Dean received compensation additional to that provided in the original subcontract. The area excavated was approximately 30 x 30. There were about 26 feet of the main exposed, about 14 feet running from the proposed north wall of the new room to the place where the main turned left and approximately 10 to 12 feet from that point eastwardly to the basement wall of building 100. The exposed main was about three or four feet above the floor of the excavated area and Dean's carpenter foreman placed 2 x 4 and 2 x 6 vertical supports under the exposed main, but neither Dean nor anyone provided bracing or shoring against the lateral or longitudinal movement of the pipe. The 6-inch main was in fact (and Dean's carpenter foreman so knew) an

active main (in which the static pressure per square inch was 85 pounds), furnishing water to building 100. The joints holding together the sections of pipe were mechanical joints which allow for ordinary expansion and which are joined by friction as opposed to being threaded or welded. As noted, the pipe was exposed early in August and remained so with vertical supports under it until the night of August 22 when the main failed and the basement of building 100 was flooded.

In the meantime, Dean was to cut a door in the wall of building 100 (to provide passage between the new room and the existing basement), and sometime between the first and fifteenth of August, by use of a jackhammer, the door was roughed in and on August 22, again by use of a jackhammer, the doorway's edges were smoothed. On that same day, August 22, Mid-Continent dug down to a joint of the main in question, at a place 18 feet north of the north wall of a new room to obtain a measurement and about the same time removed some grouting from the opening through which the water main passed from the new room area to the basement room of building 100. Mid-Continent had arranged to change from the existing main to a relocated one on Saturday, August 23. About midnight on August 22 the joint afore-mentioned, 18 feet north of the new room's north wall, came apart, and as a result water poured into the basement of building 100 and flooded the room in which was located Bell's communications equipment.

Bell proved by expert testimony that the primary cause of the failure of the main and the consequent flooding was the absence of bracing at the place where the 6-inch main made the 90-degree left turn into building 100 to prevent lateral or longitudinal movement of the pipe. The use of the jackhammer to smooth the door opening, the digging down to the joint which failed and the removal of the grout-

1. All dates are in 1958 unless otherwise stated.

ing were described as possible contributing causes. Bell's expert witness testified that there was a custom among construction contractors and plumbing contractors when a live water main was uncovered to protect it against failure by doing the necessary shoring or anchoring of that main. The evidence was that Dean, through its authorized representatives, of course, knew that the main in question was exposed about August 1 and remained exposed until its failure on August 22; that it knew that the main was an active one carrying water for certain installations at the Air Force Base; that Dean hand dug around the pipe so as not to disturb it and shored the main with vertical braces as heretofore described; that the Dean company had theretofore done work in the area of high pressure water mains; and that the president of the company, Mr. Dean, who had knowledge of the situation as to this job, had had some engineering training and that his company had done commercial building over a period of years. Mr. Dean testified that he did not consider it his responsibility to discover how much pressure was in the main or what kind of joints held the sections of pipe and that if he had known those facts he would have done nothing more than was done because his company had no contract obligation to do more, and he therefore considered it not in the area of his company's responsibility.

Dean's contention that the trial court should have directed a verdict for it at the close of the evidence is based upon the premise that the evidence failed to show there was any duty on Dean to shore the water main against longitudinal or lateral movement. Dean points to the fact that there was no contract obligation, oral or otherwise, upon it to brace the main against such movement and, therefore, says Dean, its only duty was a common-law duty which could not exist unless Dean, in the exercise of ordinary care, knew or should have known that unless the main was braced against lateral movement its failure reasonably could have been anticipated. Dean's supporting argument is that the evidence showed that other persons, such as the general contractor's engineer supervisor, the Air Force Base engineer supervisor, engineer representatives of the architects, and perhaps others, who obviously should have had superior knowledge of the danger of the failure of the main than that possessed by Dean, were present on the job from time to time during the entire period of the water main's exposure and failed to give Dean any directions or instructions with respect to lateral bracing, even though they all saw that the only existing shoring was the vertical bracing provided by the 2 x 4's and 2 x 6's. Dean concludes that it is unrealistic to place a duty upon Dean when those with superior knowledge failed to recognize the danger.

■ The trouble with Dean's argument, as we see it, is first, that we are here concerned only with the question of Dean's tort liability to a third party not a party to any contract with Dean or his prime contractor; and, second, if Dean breached a common-law duty it owed to Bell to exercise ordinary care not to cause injury to Bell's equipment, it is no defense that a similar duty may have rested upon the prime contractor, the architects, the plumbing contractor, and others, 65 C.J.S. Negligence § 102, p. 643, 38 Am.Jur., Negligence, § 64, p. 716; Schrader v. Kessler, Mo., 178 S.W.2d 355, 358 irrespective of whether the other tort-feasors did or did not have superior knowledge of the necessity, if any, to shore against lateral movement.

It seems clear that if the evidence was such that Dean, in the exercise of ordinary care, should have known what bracing was "necessary" to prevent a failure of the water main and a consequent flooding, Dean reasonably should have foreseen that unless the necessary shoring was installed some injury would result to whatever was in the basement of building 100. The question, of course, is whether Dean in the exercise of ordinary care should have known that "necessary" shoring to prevent a failure of the

water main included bracing against lateral or longitudinal movement.

■■ In determining whether Bell made a submissible case against Dean, we view the evidence in the light most favorable to Bell, give it the benefit of all favorable reasonable inferences, and disregard appellants' evidence unless it aids Bell's case. Daniels v. Smith, Mo., 323 S.W.2d 705, 706 [2]. We bear in mind also that negligence is ordinarily a jury question and where different reasonable conclusions may be supported by the facts and circumstances in evidence, the question whether one was negligent, is always for the jury. Fortner v. St. Louis Public Service Co., Mo., 244 S.W. 2d 10, 13[1–3].

■■ It is our view that a jury reasonably could have found in the circumstances of this case that Dean, in the exercise of ordinary care, should have determined what bracing was "necessary" to prevent a failure of the water main. Consequently, the jury was properly authorized to find that Dean was negligent in failing to provide bracing to prevent lateral or longitudinal movement and that such negligence contributed to directly cause injury to Bell's equipment. The reasons for our conclusion in that respect are these. As we have heretofore noted, an expert witness testified (over Dean's objection at the trial, but inasmuch as Dean does not here contend that such testimony was inadmissible and thus should not be considered in determining the question before us, we consider it evidence of Dean's duty in the premises, see Gatzke v. Terminal R. R. Ass'n of St. Louis, Mo., 321 S.W.2d 462, 467[2–4]; Carlisle v. Tilghmon, Mo., 174 S.W.2d 798, 800 [2, 3]), that there was a custom among construction contractors and plumbing contractors when a live water main was uncovered to attempt to protect it against failure by *necessary* shoring or anchorage. Should Dean have known or have discovered that bracing against horizontal or lateral movement was "necessary shoring" to protect the main against failure? Matters

in evidence which the jury could take into account in determining that question were: that Dean knew that its workmen had exposed a live active water main for a distance of 26 feet and that it remained exposed for a period of almost a month; that Dean had theretofore done work in areas close to high pressure water mains; that Dean was directed to hand dig around the water pipe; that his carpenter foreman braced the pipe with vertical supports; that Dean had had some engineering training and had done commercial building over a period of years; that Dean was unconcerned with the question of the sufficiency of the bracing because it was not a matter within its contract responsibility, and as a result made no effort to determine what constituted necessary shoring for the particular main in question. As we see it, whether, under the aforestated circumstances, there was a duty upon Dean to discover by proper investigation what kind of bracing or shoring was *necessary* to protect the main in question against failure and to provide it or to see to it that it was provided was a question peculiarly appropriate for a jury to determine.

We have examined the cases relied upon by Dean which state general rules as to foreseeability and that negligence is based upon faulty or defective foresight and upon what should have been anticipated rather than upon what happened. Those cases state well-recognized principles of law which we have taken into account in reaching our conclusion above.

It is unnecessary to consider Dean's further contentions that there was no evidence that the use of jackhammers near the exposed main or the excavating of soil around the main were proximate causes. That is because our holding that the jury reasonably could have found that Dean was liable to Bell for negligence contributing to the primary cause of the failure of the main and the consequent damage to Bell's equipment, fully answers Dean's contention that the trial court erred in failing to direct a verdict for it at the close of the evidence.

Bell submitted its case against Dean by instruction 1 and against Mid-Continent by instruction 2. Dean contends the trial court erred in failing to give its proffered converse instruction 12 and Mid-Continent contends the court erred in failing to give its tendered converse instruction 13. It seems desirable to set forth instructions 1 and 2 in full, although each is long and portions of each are identical and other parts are similar. We emphasize that no attack by either appellant has been made upon the form or content of either instruction and, consequently, no question as to their correctness is before us. Thus, the fact that we set them forth in this opinion should not be construed as approval or disapproval by us of either the form or content of instruction 1 or 2. We quote them in full in an attempt to make clear our views with respect to instructions 12 and 13.

Instruction 1 was: "The Court instructs the jury that if you find and believe from the evidence that on and prior to August 22, 1958, plaintiff Southwestern Bell Telephone Company was the owner of certain telephone and communications equipment mentioned in evidence, which was installed in a basement room in the center wing of Building 100 at Richards-Gebaur Air Force Base near Kansas City, Missouri, if you so find, and if you further find and believe that defendant Chester A. Dean Construction Company in connection with the building of a room adjacent thereto on or shortly after August 1, 1958 excavated to a depth of about 6 to 8 feet below ground level and over an area of some 30 feet square, if you so find, and in the course of such excavation, said defendant uncovered and excavated under a six inch water main supplying said Building 100, which was constructed of sections of pipe with mechanical or gasket friction joints, which said water main was located at a depth of 4 to 5 feet below ground level, and which said main made a 90 degree turn in said excavated area and then entered and passed through the basement wall of said center wing in such a manner that approximately 26 feet of said water main, including the portion making said 90 degree turn, from on or shortly after August 1, 1958 was left in said excavated area without the support, weight and friction of the earth which had been excavated from over, under and around said main and without the lateral support of the earth against the place where said main made said 90 degree turn, if you so find, and that a joint of said water main separated or ruptured during the night of August 22, 1958, and water therefrom flooded the said room where plaintiff's said communications equipment was located, if you so find; and if you further find and believe that said water main so exposed in said excavated area was not braced or shored laterally or horizontally so as to prevent movement of the said main in a lateral or horizontal direction, if you so find, *and that said defendant, during the time said water main was so exposed without lateral or horizontal support used jackhammers in removing a concrete window well from the basement wall of said center wing adjacent to the point where said main entered said wall* and in constructing a new doorway through said basement wall and that such jackhammering caused vibrations in said water main, if you so find, and if you further find and believe that defendant Chester A. Dean Construction Company knew or by the exercise of ordinary care should have known that said water main had mechanical joints which were not sufficient without lateral or horizontal bracing and shoring to hold against internal water pressure and pressure surges and movement caused by vibrations, if you so find, and that said defendant knew or by the exercise of ordinary care should have known that there was danger of a joint of said water main separating or rupturing when so exposed without such support, if you so find, and subjected to said vibrations, if you so find, and that said defendant in the exercise of ordinary care would have braced or shored said main where it was so exposed without lateral or horizontal support, and that said bracing or shoring would have prevented said water

main from rupturing and the water therefrom from flooding said basement, if you so find, and that said defendant in so excavating the soil from around said water main, if you so find, and in so failing to brace or shore the said water main against lateral or horizontal movement, if you so find, *and in so using jackhammers near said main after it was so exposed,* if you so find, failed to exercise ordinary care, then you are instructed that such failure of said defendant to exercise such ordinary care was negligence, and if you further find that such negligence, if you find that said defendant was negligent, proximately caused or contributed to cause a joint of said water main to separate or rupture and flood said room and damage plaintiff's said equipment, if you so find, then you are instructed to find the issues herein for the plaintiff Southwestern Bell Telephone Company and against defendant Chester A. Dean Construction Company." (Emphasis ours.)

Defendant Dean's proffered instruction 12 was: "The Court instructs the jury that if you find and believe from the credible evidence that at the time and place mentioned in evidence, defendant Dean Construction Company, in using jackhammers near the main after it was exposed, did exercise ordinary care, your verdict must be for the defendant Dean Construction Company."

Instruction No. 2 was: "The Court instructs the jury that if you find and believe from the evidence that on and prior to August 22, 1958, plaintiff Southwestern Bell Telephone Company was the owner of certain telephone and communications equipment mentioned in evidence, which was installed in a basement room in the center wing of Building 100 at Richards-Gebaur Air Force Base near Kansas City, Missouri, if you so find; and if you further find and believe that defendant Mid Continent Plumbing, Inc. contracted to and performed certain work consisting of installing floor drains and drainage tile on or about August 11, 1958 and preparation for a change in the water connection on or about August 22, 1958, in and near a new equipment room constructed adjacent to said center wing of Building 100, if you so find, and in connection therewith saw and in the exercise of ordinary care knew or should have known that a six inch water main supplying said Building 100 and constructed of sections of pipe with mechanical or gasket friction joints, at a depth of 4 to 5 feet below the surface of the ground extended through an area which had been excavated to a 6 to 8 foot depth below ground level over an area of about 30 square feet and in which area the said water main made a 90 degree turn and then entered and passed through the basement wall of said center wing in such a manner that approximately 26 feet of said water main, including the portion making said 90 degree turn, was left exposed in the excavated area without the support, weight and friction of the earth over, under and around said main, including at the point of said 90 degree turn, and that where so exposed said main was not braced or shored as to prevent movement of said main in a lateral or horizontal direction, if you so find, *and that said defendant during the time said water main was so exposed without lateral or horizontal support removed concrete grouting from around said water main where it passed through the wall of said center wing and at a point about 12 to 15 feet outside the wall of the new equipment room dug a hole down to the top of a joint of said main,* if you so find, and that a joint of said water main separated or ruptured during the night of August 22, 1958 and water therefrom flooded the said room where plaintiff's said communications equipment was located, if you so find; and if you further find and believe that defendant Mid Continent Plumbing, Inc. knew or by the exercise of ordinary care should have known that said water main had mechanical joints which were not sufficient without lateral or horizontal bracing or shoring to hold against internal water pressure and pressure surges, if you so find, and that said defendant knew or by the exercise of ordinary care should have

known that there was danger of a joint of said water main separating or rupturing when so exposed without such support, if you so find, and that said defendant in the exercise of ordinary care would have braced or shored said main where it was so exposed without lateral or horizontal support and that said bracing or shoring would have prevented said water main from rupturing and the water therefrom from flooding said basement, if you so find, and that said defendant in so seeing and knowing the earth had been excavated from, around said water main, if you so find, and in so failing to brace or shore the said water main against lateral or horizontal movement, if you so find, *and in so removing grouting and digging down to a joint after the main was so exposed*, if you so find, failed to exercise ordinary care, then you are instructed that such failure of said defendant to exercise such ordinary care was negligence, and if you further find that such negligence, if you so find that said defendant was negligent, proximately caused or contributed to cause a joint of said water main to separate or rupture and flood said room and damage plaintiff's said equipment, if you so find, then you are instructed to find the issues herein for the plaintiff Southwestern Bell Telephone Company and against the defendant Mid Continent Plumbing, Inc." (Emphasis ours.)

Mid-Continent's proffered instruction 13 was: "You are instructed that if you find and believe from the evidence that at the time and place mentioned in evidence defendant Mid-Continent Plumbing, Inc., in removing grouting and digging down to the joint after the main was exposed, exercised ordinary care, your verdict must be for defendant Mid-Continent Plumbing, Inc."

Dean and Mid-Continent each contends that it was entitled to the converse instruction it submitted in that each instruction submitted the converse of one of the essential elements of negligence which were conjunctively submitted in Bell's main instructions.

The cases cited in the several briefs reaffirm that a defendant is, of course, entitled to a converse instruction; either the exact converse of a plaintiff's verdict-directing instruction or the exact converse of an essential element of a plaintiff's claim, or a defendant may submit facts, supported by evidence, which would disprove one or more of the basic facts of a plaintiff's case. See for example, among the many cases so holding, Liebow v. Jones Store Co., Mo., 303 S.W.2d 660, 662.

Each appellant contends that Bell's verdict-directing instructions 1 and 2 each clearly presented three different assignments of negligence in the conjunctive and that, consequently, each defendant was entitled to an instruction conversing one or more of those assignments. Bell contends that each of its verdict-directing instructions 1 and 2 submitted only one assignment of negligence consisting of a combination of hypothesized acts of commission or omission under the circumstances detailed in the fore part of each instruction. It is true, as Bell contends, that a plaintiff may choose to so frame an instruction as to require a finding that the commission of all of several hypothesized acts is the submitted negligence rather than, as a plaintiff may do, require a finding that the commission of each of several hypothesized acts constituted negligence. See Glowacki v. Holste, Mo., 295 S.W.2d 135, 139, 140. Upon an analysis of the two verdict-directing instructions in this case we have the tentative opinion that Bell correctly contends that only one assignment of negligence was submitted as to each appellant consisting of the doing or failure to do all of three or more specified acts; but we need not rule that issue because even if we assume, as appellants contend, that instructions 1 and 2 each hypothesized conjunctively three different assignments of negligence, we are of the

view that each of the proffered converse instructions was defective in the respect hereinafter noted and, consequently, that the trial court may not be convicted of error for failing to have given either of them.

Dean's instruction 12 undertook to converse that part of Bell's instruction 1 which stated "and in so using jackhammers near said main after it was so exposed." Now the prior portion of instruction 1 to which the words "so using" and "so exposed" referred was that portion of the instruction first italicized above, viz., "and that said defendant, during the time said water main was so exposed without lateral or horizontal support used jackhammers in removing a concrete window well from the basement wall of said center wing adjacent to the point where said main entered the wall * * *." Instruction 12, the proffered converse, required the finding that "in using jackhammers near the main after it was exposed" Dean exercised ordinary care. It seems apparent that instruction 12 omitted any language descriptive of the condition of the main at the time it was "exposed," i. e., "without lateral or horizontal support." Not only did instruction 12 fail to contain any such language, it did not even contain the word "so" to modify "using jackhammers" or the word "so" in connection with the word "expose." Nor did instruction 12 in any other way refer to the circumstances, set forth in Bell's instruction 1, under which the jackhammers were used.

■ The essential issue (as to the use of jackhammers) to be conversed was that during the time the water main was exposed *without lateral or horizontal support*, Dean used jackhammers in removing a concrete window well, etc. As noted above, the proffered converse did not submit the essential fact that at the time Dean used a jackhammer the *water main was without lateral or horizontal support*; obviously, the critical question upon which liability depended. Consequently, it appears that instruction 12 omitted an essential part of the issue to be conversed and was therefore an incomplete converse which may have circumscribed the factual bases or a part of the factual bases for Bell's recovery.

■ Instruction 13 which purported to converse one essential element of instruction 2 is defective for essentially the same reason stated as to instruction 12. The part of Bell's instruction 2 which Mid-Continent's instruction 13 purported to converse was this, "and in so removing grouting and digging down to a joint after the main was so exposed." The prior portion of instruction 2, to which the words "so removing" and "so exposed" referred, was that portion of instruction 2 first italicized above and was, "and that said defendant during the time said water main was so exposed without lateral or horizontal support removed concrete grouting from around said water main where it passed through the wall of said center wing, and at a point about 12 to 15 feet outside of the wall of the new equipment room dug a hole down to the top of a joint of said main * * *." Instruction 13, the proffered converse, required the finding that, "in removing grouting and digging down to the joint after the main was exposed," Mid-Continent exercised ordinary care. Again, as did instruction 12, instruction 13 omitted any language descriptive of the condition of the main at the time it was "exposed," i. e., "without lateral or horizontal support." And, like instruction 12, 13 failed to use the word "so" to modify "removing grouting" or to modify "exposed" and in no other way referred to the circumstances set forth in Bell's instruction 2 under which the grouting was removed or the digging down was done. The essential issue to be conversed was whether Mid-Continent, at a time when the water main *was exposed without lateral or horizontal support*, removed the concrete grouting and dug down to a joint. It follows that instruction 13 omitted an essential element of the issue to be conversed and was defective for the

reason set forth in our conclusion as to instruction 12.

■■ It is well established that when erroneous instructions are presented in a civil case, a trial judge is under no duty to correct or modify them in any respect, and that instructions should be clear declarations of law applicable to the facts. Gaskill v. Cook, Mo., 315 S.W.2d 747, 756 [6, 7]. The trial court will not be convicted of reversible error for refusing to give an instruction which is not substantially correct. Wegener v. St. Louis County Transit Co., Mo., 357 S.W.2d 943, 948 [3, 4]. Neither proffered converse instruction 12 or 13 was substantially correct in that each omitted an essential part of the issue to be conversed. We hold, therefore, that the trial court did not commit reversible error in refusing to give instructions 12 and 13.

Appellant Dean contends further that the trial court erred in excluding portions of the contract between the United States and the prime contractor, Truog-Nichols. The trial court admitted in evidence the first two pages of that contract (excluding from the jury's view the monetary amount involved). The portions of the exhibit examined by the jury, however, clearly disclosed that the contract was between the United States and Truog-Nichols. There was no dispute in the evidence and the record shows clearly that each of the present appellants was a subcontractor of Truog-Nichols, the prime contractor. And, as we have heretofore indicated, the prime contractor had settled with Bell its alleged liability for contributing to Bell's damage and the jury by instruction 5 was told that plaintiff had been paid the sum of $21,000 by Dan Truog and Clyde Nichols, Inc., and that such fact should not be considered as evidence that either Dean or Mid-Continent was negligent or that Bell's equipment was damaged; and, further, by instruction 4, that the jury would deduct $21,000 from whatever amount, if any, it found was the total damage to Bell's equipment.

Appellant Dean contends that three other proffered and excluded portions of the contract should have been examined by the jury. The parts in question were provisions: that the prime contractor would personally superintend the work; that the prime contractor would protect and preserve materials and equipment in all work performed and if the government decided that material, equipment, supplies, and work performed were not being adequately protected it could proceed to protect and charge the contractor therefor; that the prime contractor should protect existing structures, utilities and work of any kind against damage or interruption of service, and any damage or interruption should be restored promptly at the expense of the contractor.

Dean contends that it was necessary that these portions of the contract be before the jury in order "that the parties be clearly identified and the responsibilities at the scene delineated. The respondent's constant reference to Dean as the contractor could easily have misled the jury into a belief that Dean had more responsibility than called for either by contract or by the exercise of ordinary care." Dean further contends that only by reference to the contract between the government and Truog-Nichols could the jury determine the duties devolving upon the various actors. We think neither of those contentions is well taken.

■ In the first place, as we have heretofore indicated, the parties were clearly identified and their relevant responsibilities were clearly delineated. The details of their contract responsibilities were not relevant in this case based upon an alleged breach by appellant Dean of a common-law duty as opposed to a breach of any contractual obligation and, as we have also indicated, the jury could not have misunderstood the relationship of the parties to each other and to the government.

With respect to the contention that the contract would show the duties devolving upon the various actors, it is a sufficient answer that Dean's liability was not based upon any contract (either the one between the United States and Truog-Nichols or the one between Truog-Nichols and Dean), but upon an alleged breach of Dean's duty to exercise the care imposed by the common law under the circumstances shown in evidence. Zuber v. Clarkson Const. Co., 363 Mo. 352, 251 S.W.2d 52, 55.

In view of the foregoing and taking into account the fact that the trial court did admit enough of the contract to clearly indicate to the jury who the prime contractor was and that the contract was between the government and the prime contractor, and taking into account that other evidence clearly showed the fact that both Dean and Mid-Continent were subcontractors of Truog-Nichols, our conclusion is that the trial court did not err in excluding the three proffered portions of the contract between the United States and the prime contractor.

Dean contends finally that the trial court erred in giving a portion of Bell's damage instruction 4 which was, in part: "The Court instructs the jury that if your verdict is in favor of the plaintiff Southwestern Bell Telephone Company under the evidence and the instructions of the Court, then you should assess plaintiff's damages, if any, at such sum as you find and believe from the evidence to be the difference, if any, between the reasonable value of plaintiff's equipment mentioned in evidence which was located in the basement room of Building 100 at Richards-Gebaur Air Force Base, on August 22, 1958 immediately before the rupture of the water main and the flooding of said room, and the reasonable value of said equipment after the flooding of said room had taken place, if you find and believe that said difference in value, if any, directly resulted from the water damage; *and in determining the difference in said value, if any, you may take into consideration* the necessary expense, if any, incurred by plaintiff in repairing and restoring said equipment to a usable condition, the actual cost of new equipment required to replace damaged equipment, if any, less the salvage value, if any, of the damaged equipment, *and the diminished value after repair of the equipment not replaced,* if any, as you may find from the evidence to be a direct result of said water damage, if any." (Italics ours.) The remainder of the instruction directed the jury to deduct $21,000 from Bell's total damages, if any.

Thus, the jury was instructed to assess Bell's damages at such sum as it found to be the difference between the reasonable value of plaintiff's equipment immediately before the flooding and the reasonable value after the flooding if that difference resulted from the water damage; and in determining that difference the jury was permitted to consider certain stated matters, among which was "the diminished value after repair of the equipment not replaced * * *."

Bell's inventory and cost engineer, who qualified as an expert in his field, testified that certain equipment which was not replaced but was repaired was reduced in value by 25 per cent. He said that the value of the equipment was a certain amount at the time of the flooding and that he deducted therefrom the cost of some items that were actually added, and reduced the value of the remaining equipment by 25 per cent because, in his judgment, the service life of the remainder would have been reduced by that much. There was testimony that the equipment above the water line was affected so that most of the communications cables, even though not under water, had to be opened and dried and that the humidity caused corrosive action in the equipment above the water line.

Dean contends that there was no substantial evidence to justify the direction that the jury might consider "the diminished value after repair of the equipment not replaced." It seems clear to us,

however, that an expert's positive testimony based not only upon his own experience and knowledge but upon other testimony in the record was not speculative but was substantial evidence of the diminished value after the repair of the equipment not replaced. Furthermore, and in any event, as we have heretofore noted, this item, that is, the diminished value after repair of the equipment not replaced, was only a matter which the jury permissively could consider in determining the damage suffered by Bell, if any. The damages, if any, to be allowed were correctly submitted as the amount of the difference in the equipment's value before and after the flooding.

The judgment against both appellants should be and it is affirmed.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.